UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:

SURGERY CENTER OF VIERA, LLC,

*Plaintiff*,

v.

UNITEDHEALTHCARE INSURANCE
COMPANY, AMERICAN COMPASS,
INC., and AMERICAN COMPASS, INC.,
PLAN,

*Defendants*.
_____/

**COMPLAINT**

Plaintiff, Surgery Center of Viera, LLC ("SCV"), as medical provider, authorized representative, and assignee of patient / insured, J.S., sues Defendants, UnitedHealthcare Insurance Company ("UHC"), American Compass, Inc. ("AC"), and American Compass, Inc., Plan (the "Plan"),[1] as follows:

---

[1] The insurance policy / Plan document (effective December 1, 2016, and operative for the subject November 22, 2017, medical procedure) is attached hereto as **Exhibit A** and fully incorporated herein by reference. Upon information and belief, the Plan is self-funded. Should it someday be discovered, however, that the Plan is fully insured, SCV is amenable to dismissing the AC Defendants from this action.

1

## NATURE OF THE ACTION, PARTIES, JURISDICTION, AND VENUE

1. This action arises (Count I), under state law for Defendants' wrongful, unsubstantiated underpayment of monies owed to SCV for medical services SCV provided to the patient / insured, J.S., on November 22, 2017, which such cause of action has nothing to do with "right of payment" / coverage (*i.e.*, has everything to do with "rate of payment" / benefits unreasonably low payment amount) and which such cause of action has to do with third-party re-pricing contract separate and distinct from the insurance policy / Plan document.

2. At all material times, SCV was a medical provider and a Florida limited liability company with its citizenship (*i.e.*, principal place of business / "nerve center") in Viera, Florida, Brevard County. SCV is *sui juris* in all respects. SCV's members are as follows: (a) Dr. Ara Deukmedjian, domiciled in Brevard County, Florida, (b) Sun Deukmedjian, domiciled in Brevard County, Florida, and (c) Dr. Bharat Patel, domiciled in Brevard County, Florida. At all material times, SCV was the authorized representative of J.S. with an assignment of benefits as well,[2] having provided subject medical services to J.S. for which a proper amount of compensation (Count I) was / is due and owing.

---

[2] All germane authorization and / or assignment paperwork in SCV's possession is attached hereto as **Exhibit B** (in redacted form) and incorporated fully herein by reference.

And, again, Defendants honored such authorized representative and assignee capacities by, for examples, carrying out pre-suit appeals with SCV and tendering partial claim payments directly to SCV.

3. At all material times, UHC was an insurance company with its citizenship (*i.e.*, state of incorporation) and principal place of business / nerve center in the State of Minnesota and engaged in the business of selling and / or administering health insurance and / or deciding health insurance claims (*i.e.*, claim administering).

4. At all material times, AC's citizenship (*i.e.*, state of incorporation) and principal place of business / headquarters ("nerve center") was / is in the State of California. At all material times and pertinent hereto and upon information and belief, AC was engaged in the administration and sponsorship of the subject Plan. Upon information and belief, the Plan is simply a paperwork creation by AC; *i.e.*, does not have a state of incorporation and / or principal place of business, let alone one separate from that mentioned above in relation to AC.[3]

5. This Court has jurisdiction over the entire dispute pursuant to Title 28, United States Code, Section 1332, as complete diversity exists between the

---

[3] If the AC Defendants had nothing to do with pre-suit claim and / or appeal decision-making as to the unreasonably low rate of payment at issue here, SCV is willing to dismiss without prejudice the AC Defendants if the AC Defendants were to agree / stipulate as to the following: prompt satisfaction of monies deemed owed to SCV by the trier of fact; *i.e.*, prompt satisfaction of outstanding benefits when UHC's claim / appeal decision-making as to the amount of medical service monies tendered to SCV is someday determined improper.

parties and the amount in controversy exceeds $75,000.00 exclusive of interest, costs and attorney's fees.

6. Venue is proper in the Middle District Court of Florida pursuant to Title 28, United States Code, Section 1391(b), since, for examples, (a) a substantial part of the events or omissions giving rise to the subject action occurred in this jurisdiction, namely the subject medical procedure and Defendant's underpayment of the subject insurance claim both at the initial claim and subsequent pre-suit appeal stages (Count I), and (b) the Orlando Division of this Court has personal jurisdiction due to Defendant's minimum contacts in this forum.

7. All conditions precedent to the institution of this action (*e.g.*, administrative pre-suit appeals) have occurred, been performed, been waived, or were futile.

## COMMON ALLEGATIONS

8. The patient's Member I.D. number was / is 967935126, the UHC assigned case number was / is R2481611001, the group number was / is 8W2767 (per UHC correspondence) and / or GA8W2767IM (per Ex. A), and the authorization codes (discussed again below) were / are A032864950 and A032553873. Again, a copy of the insuring agreement (which is separate and distinct from the re-pricing contract / agreement at issue in this lawsuit, *see* **Exhibit C** incorporated fully herein by reference, and / or whatever mystery re-

pricing contract / agreement / formula / program that Defendants implemented in arriving at the rate of payment furnished here) is attached as Exhibit A and incorporated fully herein by reference.

9. At all material times, J.S. was covered (*i.e.*, coverage is not an issue here) by the Plan as evidenced by several things, with examples now discussed (and more discussed below).

    a. If J.S. was not an eligible / covered insured, the subject claim would not have been paid by Defendants in any amount, and this eligibility and claim payment correlation reality is stated in the pre-authorization paperwork discussed below and attached as **Exhibit D** (UHC letters dated November 9, 2017, and November 16, 2017). Exhibit D is incorporated fully herein by reference.

    b. If the subject surgery (which such surgery was broken down by codes found in the HCFA found in SCV's initial claim submission packet) had not been covered,[4] the subject claim would not have been paid by Defendants in any amount. Regarding coverage of the subject HCFA codes, Defendants' EOB furnished on UHC letterhead (further discussed below) is attached as **Exhibit F** and evidences Defendants' coverage decision. Exhibit F (made up of

---

[4] SCV's twenty-one-page claim submission package to Defendants, inclusive of the HCFA, is attached as **Exhibit E**. Exhibit E is incorporated fully herein by reference.

EOB(s) dated December 29, 2017) is incorporated fully herein by reference. And as one can plainly see from the UHC-issued EOB, Defendants unilaterally re-priced the subject claim (somehow) and did not deny any aspects of the claim in dispute here on coverage grounds (*e.g.*, medical necessity, experimental / investigational). To this day, we really have no idea how Defendants came up with payment totaling $56,096.13 (on a billed amount of $293,168.00, *see* Ex. E) because at every turn (SCV's requests and undersigned counsel's requests), Defendants have secreted how it came up with $56,096.13; *i.e.*, have never substantiated their determination that $56,096.13 was a "usual, customary, reasonable" ("UCR") amount of payment for the subject procedure or otherwise in compliance with the insurance policy's "eligible expense" provision discussed below. "Unilaterally" because an applicable re-pricing contract (that SCV had actually agreed to, unlike the unagreed to mystery Defendants' re-pricing contract / agreement / formula / program seemingly *via* Optum, *see* Ex. F)[5] was already in place (*see* Ex. C). Again, Plaintiff presently does not possess the paperwork associated with

---

[5] UHC owns Optum. Conflict of interests? Yes.

the mystery Defendants' (Optum) re-pricing formula because Defendants have wrongly secreted this paperwork (the very paperwork that would evidence how Defendants came up with their unreasonably low rate of payment) from SCV in their perpetual refusal to substantiate the unjustifiably low rate of payment force-fed to SCV here. But, as with the re-pricing contract (Ex. C) that SCV maintains should apply here in determining the proper rate of payment, the mystery Defendants' (Optum) re-pricing contract / agreement / formula / program unilaterally implemented by Defendants in arriving at the disputed low claim payment amount is also separate and distinct from the insurance policy / Plan document (Ex. A). Meaning, there is no "relation to" defensive ERISA preemption at play with a pricing dispute of this nature predicated on re-pricing contracts standing alone from Exhibit A. Put differently, this is an ordinary breach of contract action revolving around Exhibit C.

In sum, as evidenced by the variety of things noted in this averment, this action has nothing to do with coverage (*i.e.*, "right of payment"), it has everything to do with the amount Defendants paid out (*i.e.*, "rate of payment") on covered HCFA codes based on a mystery Defendants' (Optum) re-pricing contract / formula / program separate and distinct from the Plan insurance

document (Exhibit A). In other words, the mystery Defendants' (Optum) re-pricing contract / formula / program that Defendants used in re-pricing the subject claim and the re-pricing contract / agreement (Ex. C) that SCV contends should have been used do not "relate to" the Plan document (Ex. A); *i.e.*, resolution of Count I will not relate to (at least not beyond a fleeting reference to, at most) the Plan document (Ex. A). Once more, "relation to" defensive ERISA preemption simply does not apply here in relation to Count I. And as many Courts (several in this jurisdiction, to boot) have found, complete preemption most definitely does not apply to cases of this ilk.

10. The fact that this dispute has nothing to do with coverage (*i.e.*, has everything to do with pricing / rate of payment) is further evidenced by Defendants' pre-surgery authorization paperwork (*see* Ex. D). The pre-surgery authorization paperwork (Ex. D) and process is designed to put coverage (but not the eventual amount of claim payment) to rest, which, as discussed above (and as evidenced by Ex. D) is what happened – Defendant deemed the subject procedure medically necessary (which such medical necessity would relate to coverage). Exhibit D is incorporated fully herein by reference.

11. At all material times leading up to the subject medical services received from SCV, J.S. suffered from lumbar radiculopathy and neurogenic symptomology originating from J.S.' lower back with associated lower back pain in and around L4-L5 / L5-S1, which such discs were damaged spondylitic. J.S.

8

tried alternative, conservative management treatments, which failed and surgical treatment was deemed medically necessary by both SCV (as evidenced by, for examples, the "operative note," "history and physical," and "letter of medical necessity for surgery" found in SCV's claim submission package, *see* Ex. E) and Defendants (as evidenced by, for example, the pre-authorization paperwork attached as Exhibit D, which such pre-authorization paperwork was also included in SCV's claim submission package). So, on November 22, 2017, SCV operated on J.S. to remedy the medical conditions.

12. By letters dated November 9, 2017, and November 16, 2017, and prior to the subject procedure, UHC issued information to SCV approving surgical codes. As mentioned above, this paperwork is attached as Exhibit D.

13. As mentioned above, SCV's billed charges for the subject medical services rendered to J.S. totaled $293,168.00 (*see* Ex. E), and a claim package was promptly submitted to Defendants relating to same *via* certified mail (certificate number 7001 2510 0003 9686 2446). The SCV cover letter to its claim submission packet (*see* Ex. E) makes specific reference to SCV's appropriate expectation that claim payment would unfold pursuant to a re-pricing contract (*see* Ex. C) that existed (not some unknown Defendants' (Optum) re-pricing contract that Defendants would eventually unilaterally employ), which, again, such re-pricing contracts (even the yet discovered mystery Defendants' (Optum) re-pricing formula) do not "relate to" the Plan

9

document (Exhibit A); *i.e.*, again, resolution of Count I (which hinges on the appropriate re-pricing mechanism, the re-pricing contract attached as Exhibit C) will require little (if any) reference to Exhibit A and certainly not a substantive reference to / "interpretation of" Exhibit A, which such substantive reference / "interpretation of" a plan document (rather than a cursory glance at a plan document, as *might* be required here) in order to resolve a rate of payment dispute is what would militate toward "relation to" defensive ERISA preemption.

14.  At all material times, UHC was in agreement with Preferred Medical Claim Solutions ("PMCS") (as UHC's affiliate and / or subcontractor and / or vendor and / or agent and / or the like) to secure discounted rates from providers (like SCV), which were secured here in relation to SCV.[6]

15.  The PMCS allowed amount re-pricing contract (*see* Ex. C) was in full force and effect and was a legally valid and binding contract that established / developed (a) an allowed amount re-pricing rate of 80% of SCV's billed charges less patient responsibilities (*e.g.*, co-pay, deductible, co-insurance) subject to the patient's annual out-of-pocket maximum, and (b) a 100%

---

[6]Again, a copy of the pertinent pages of the PMCS re-pricing contract that was procured on UHC's behalf (along with the PMCS "client" list listing UHC) is attached hereto as Exhibit C. Again, Exhibit C is incorporated fully herein by reference. Of note, in its claim submission cover letter (*see* Ex. E), SCV made clear its expectation that the claim would be re-priced pursuant to the re-pricing contract / agreement that was brokered by UHC with PMCS being UHC's vendor, agent, or the like tasked with achieving discounted rates from medical providers like SCV.

reimbursement rate for hard costs (*e.g.*, prosthetics / implants).

16.     Notwithstanding the existing PMCS contract / agreement in place (which, again, was arranged by UHC with PMCS as its vendor / agent), by way of EOB(s) dated December 29, 2017, on UHC letterhead, Defendants underpaid the subject claim, tendering $56,096.13 in total predicated on some mystery (Optum) re-pricing formula falling outside Exhibit A implemented by UHC and / or whatever mystery re-pricer Defendants enlisted. More specifically, Defendants failed to properly pay (proper amount, that is) the codes billed by SCV in connection with the medical procedure.

17.     This matter does not present a coverage dispute (*i.e.*, "right of payment" dispute) because Defendants properly conceded coverage *via* the $56,096.13 partial claim payment (and pre-authorization paperwork, for that matter, *see* Ex. D) and did not list any medical judgment related basis (*e.g.*, medical necessity or experimental / investigational) for partial payment amongst the claim decision EOB codes (*see* Ex. F) / HCFA codes (*see* Ex. E) that are at issue here. Rather, this is a damages dispute (*i.e.*, "rate of payment" dispute) pertaining solely to the underpayment that was predicated on Defendants' aberrant claim decision-making seemingly predicated on the unsubstantiated mystery (Optum) rate system employed (if a system even exists) by Defendants. And, again, whatever mystery Defendants' (Optum) re-pricing contract / formula / agreement / program that was employed by

Defendants is outside of Exhibit A. To be clear, and again, this dispute revolves around the re-pricing established by Defendants separate and distinct from Exhibit A and SCV's contention that the re-pricing contract separate and distinct from Exhibit A that should have been employed (*see* Ex. C). To be clear, and again, the re-pricing dispute does not involve a substantive "interpretation of" (or perhaps any "interpretation of") Exhibit A.

18. Following the adverse Defendants' claim underpayment *via* EOB dated December 29, 2017, appeals and / or reconsideration processes were timely carried out by SCV, culminating in 2019.

19. Again, if one looks at the EOB (which does not necessitate examination or "interpretation of" Exhibit A), it is plain that coverage is not at issue here – Defendants properly conceded coverage *via* initial partial payment. *See* Ex. F. And, again, as to the codes that SCV places at issue in this lawsuit, one can also look to the pre-authorization paperwork (which does not necessitate examination or "interpretation of" Exhibit A) to see that coverage is not at issue here. *See* Ex. D (as stated earlier, Exhibit D shows that the subject pre-authorization put coverage issues to rest, leaving only pricing issues). Again, the sole issue here is one of payment amount, so we turn now to germane insurance policy language in that vein just for a baseline understanding (not at all for substantive reliance).

20. As to re-pricing, the insurance policy / Plan document (Ex. A) provides, in pertinent part, that payment is based on the following:

> For **Non-Network Benefits,** Eligible Expenses are based on either of the following:
> - When Covered Health Services are received from a non-Network provider, Eligible Expenses are determined based on:
>   - Negotiated rates agreed to by the non-Network provider and either us or one of our vendors, affiliates or subcontractors.

Ex. A at 41 (emphasis in original). The "negotiated rate" by a UHC "vendor[ ], affiliate[ ] or subcontractor[ ]" is exactly what PMCS (UHC's re-pricing vendor) determines in establishing rate of payment. This is where the fleeting examination of Exhibit A would end in this case, which such fleeting examination does not rise to the level needed to establish "relation to" ERISA defensive preemption.

21. Again, where (as here) separate and distinct re-pricing contracts / agreements have been established to determine "eligible expense" (*i.e.*, allowed amount), *see* Ex. C, such a contract / agreement controls. Defendants' own conduct evidences that much at least – Defendants implemented a mystery (Optum) re-pricing contract / agreement / formula / program separate and distinct from Exhibit A, leading to the amounts of payment furnished under EOB dated December 29, 2017. So, Defendants should not now (through its lawyers' *ex post facto* arguments) be heard to say that "relation to" defensive preemption applies to this dispute – at minimum, what is good for the goose is

13

good for the gander; *i.e.*, at minimum, waiver and / or estoppel are at play.

22. Defendants' implementation of their mystery (Optum) re-pricing contract / agreement / formula / program is untenable because SCV did not agree to same and, more importantly, the parties had previously agreed to a rate of payment contract (*see* Ex. C).

23. Once more, to date, it is unclear how Defendants ended up re-pricing the subject claim and / or why Defendants deviated from (or reneged on) the re-pricing contract that had been established between the parties (*see* Ex. C). But what is clear is that this dispute revolves around re-pricing contracts separate and distinct from the Plan document (Ex. A) and is accordingly not defensively preempted.

24. Defendants wronged SCV in many ways, most notably by way of the significant underpayment. Defendants should have employed the PMCS re-pricing contract (Ex. C) already in place (*i.e.*, already agreed to between the parties) to assess a proper re-priced amount; but, instead, Defendants implemented a mystery (Optum) re-pricing system (not agreed to by SCV) separate and distinct from Exhibit A to arrive at the low rate of payment at issue.

25. Under the PMCS re-pricing analysis (which, again, was a re-pricing contract / agreement established by UHC that SCV actually agreed to, and unlike the Defendants' mystery (Optum) re-pricing contract / agreement / formula / program that Defendants unilaterally employed here without SCV's

14

agreement), Defendants should have used an 80% / 100% rating system to calculate the allowed amount equaling $247,622.00 (which such amount is 80% of all non-implant HCFA line-items and 100% of all implant HCFA line-items). This is the amount that the assumed patient responsibilities (capped at an annual out-of-pocket maximum) should have been deducted from. The $247,622.00 less Defendants' prior payment (which such prior payment presumably already took patient responsibilities subject to the annual out-of-pocket maximum into consideration) leaves an outstanding balance of $191,525.87 due and owing to SCV. This amount is exclusive of attorneys' fees, costs, interest, and / or extra-contractual exposure.

26. SCV has suffered significant financial harm no matter how one slices this situation. The financial harm by way of owed medical services monies is in excess of $75,000.00, not including interest of attorneys' fees, costs, or interest, if the negotiated, agreed to 80% / 100% rate prescribed by UHC's third-party re-pricing vendor (PMCS) is honored / enforced as it should be.

27. SCV exhausted the pre-suit appeal process in an effort to accomplish Defendants' doing the right thing (*i.e.*, properly compensating SCV) sans litigation, to no avail. Hence, this lawsuit as SCV's regrettable last resort.

## COUNT I – BREACH OF RE-PRICING CONTRACT, EX. C
## (CLAIM UNDERPAYMENT)

SCV re-alleges Paragraphs 1 through 27 as if fully set forth herein, and

further alleges as follows.

28. At all material times to this action and in exchange for a valuable premium, J.S.' health was insured under the Plan document (Exhibit A).

29. The subject medical services were covered under the Plan document, as evidenced by, for examples, (a) Defendants' partial payment relating to same, (b) the UHC-issued EOB (Ex. F), (c) pre-authorization paperwork (Ex. D) approving the subject HCFA codes (Ex. E), and (d) *et cetera*. A fuller discussion as to why coverage is not at issue in this pure pricing dispute can be found in the above common allegations, namely Paragraphs 8-9.

30. Defendants erred in deciding to not fully compensate SCV by only tendering a $56,096.13 underpayment in relation to $293,168.00 in billed charges predicated on Defendants' mystery, unagreed to (Optum) re-pricing contract / agreement / formula / program separate and distinct from Exhibit A. As to all codes set forth on the HCFA (Ex. E), Defendants should have honored the re-pricing contract (PMCS) included in Exhibit C that the parties had actually already agreed to. Defendants' payment amount comes nowhere close to the re-pricing formulas prescribed by PMCS (80% HCFA non-implant codes / 100% HCFA implant codes). *See* ¶ 25, *supra*. Defendants' payment amount is accordingly in breach of the subject re-pricing contract (Ex. C).

31. Defendant's $56,096.13 underpayment does not constitute a usual, customary, reasonable re-priced / allowed amount / eligible expense no

matter how one views the situation. First, for example, a third-party repricing vendor who UHC contracts with (PMCS) has established SCV's UCR (or eligible expense) based re-priced / allowed amount at 80% of billed charges in relation to non-implant HCFA line-items and 100% in relation to implant HCFA line-items.

33. Defendants, among other things, had a duty to properly investigate the subject medical services, adjust / investigate the subject SCV claim relating to such services, and fully compensate SCV in relation to same. Defendants failed SCV in these regards (most notably with respect to its failure to pay the monies due and owing under the subject re-pricing contract), which breached the subject re-pricing contract / agreement and / or violated state law.

33. As a direct, foreseeable, and proximate result of Defendants' breach of their obligations under the re-pricing contract, SCV has suffered and continues to suffer damages.

34. SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' underpayment of the monies owed to it in relation to the subject J.S. medical services.

35. As a further result of Defendants' refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or pursuant to a prospective offer of

17

judgment shifting or as otherwise awardable.

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendants, UnitedHealthcare Insurance Company, American Compass, Inc., and American Compass, Inc., Plan, for liability and for damages including, but not limited to, (a) past-due contractual monies owed in relation to the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or pursuant to a prospective offer of judgment shifting or as otherwise awardable, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## JURY DEMAND

36. Plaintiff, Surgery Center of Viera, LLC, demands a trial by jury on all issues so triable as a matter of right.

Dated: February 23 2022.

Respectfully Submitted,

**CALLAGY LAW, P.C.**
1900 N.W. Corporate Blvd., Ste 310W
Boca Raton, Florida 33431
(561) 405-7966 (o); (201) 549-8753 (f)

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
Fla. Bar No. 41103
jgreyber@callagylaw.com
hcasebolt@callagylaw.com
*Attorney for Plaintiff*